Our last case on the argument calendar this morning is American Whitewater v. U.S. Forest Service. When you're ready, counsel. Good morning, Your Honors. May it please the Court. I'm Oliver Stiefel on behalf of Plaintiff's Appellants, who are seven organizations with thousands of members across California. I'd like to reserve five minutes of my time for rebuttal. All right. We're here today on an Administrative Procedure Act challenge to the U.S. Forest Service's review and approval of hazard tree logging operations on over 5,700 miles of National Forest System roads on nine national forests. And just for some perspective, that's approximately equivalent to driving up and down on I-5 in California four times. In my presentation today, I'll take the issues in our briefing in reverse order, if I may, starting with the hard look claims under NEPA and then moving to the alternatives claim, because I think that one really ties everything together in that based on the hard look that the agency should take, it can evaluate ways to tailor operations to promote public safety objectives and also sensitive ecological values. So turning first to the cumulative impacts claim, if I may, the standard requires the agency to evaluate the effects of the action when added to the effects of past, present, and reasonably foreseeable future actions. And here we really have a cut-and-dried cumulative effects violation on two grounds. First, the analysis that the agency provided was incomplete. There are a number of other projects that the agency simply failed to consider. And second, for the projects that the agency did consider, there's no quantified or detailed information, which is the standard that this court has articulated on numerous occasions. In terms of the incompleteness of the analysis, the only basis that the Forest Service offered on the record for ignoring many of the projects that my clients raised was that these projects either did not overlap or were not reasonably foreseeable, and that's just factually incorrect. We point in our briefing to the McFarland Project. That's one example. There are a number of others, including the River Complex Project, the Bear Country Project, that were raised by both my clients, American Whitewater, as well as Klamath Forest Alliance, 3ER393, 3ER418. So these were all reasonably foreseeable projects that overlapped with the R5 Project, but the agency simply didn't disclose or consider them. So turning to the insufficiency of the analysis, that's the project that the agency allegedly considered at Appendix C of each of the environmental assessments. This Court's precedents make abundantly clear general statements of possible effect and some risk are inadequate, and that's precisely what we have here. So, of course, Appendix C is just a mere listing of the projects. Turning to the substance of the environmental assessments, there's just no analysis of all of these federal logging projects that would overlap in space and time with the R5 Project. And then turning to kind of the extra EA documents that my friend on the other side points to, there's also no meaningful analysis that actually enumerates the effects of these other federal logging projects and adds them to the effects of the R5 Project. On your cumulative effects argument, I'm looking at, starting from ER16, the District Court had a pretty detailed analysis of each argument that you raised. Perhaps it would be more helpful for me, for purposes of today's argument, if you can point out where was the error in the District Court's analysis here? I know you're raising the same arguments that you raised below, but is there something about the District Court's analysis that you think is totally off that we need to focus on? I do, Your Honor. Of course, this is on de novo review. But in terms of the District Court's order — I understand that, but the District Court had a careful discussion of the points that you raised below that you're now re-arguing on appeal. I think the clear error in the District Court's opinion is that the District Court relied on a case involving the Endangered Species Act versus this Court's precedents involving the National Environmental Policy Act. So the District Court said essentially that it was okay for the agency to disregard all of these overlapping and reasonably foreseeable projects and cited the Endangered Species Act case law. Of course, cumulative effects under those two statutes are different, and we think that it would have been more appropriate, indeed required, for the District Court to rely on the bevy of cumulative effects case law from this circuit. So that's a principal error. And then I think the District Court also, in terms of the sufficiency or, we argue, insufficiency of the analysis, the District Court really credited these extra EA documents, such as the biological assessments and the biological opinions. But respectfully, we submit that the District Court focused on kind of the number of pages and ignored the substance of the analysis. So I would point this Court particularly to 2 SER 461 through 470, and that's where the agency is looking at cumulative effects to threatened and endangered species in the North Zone. And there's just no there there. There's no articulation of the effects from all of these reasonably foreseeable future projects that the agency said it allegedly did consider from Appendix C. Unless there's any further questions about cumulative impacts, I'll turn to you. Quickly, before you move off on that, so does Seven County change anything here, in your view? Not with respect to cumulative effects, Your Honor. Seven County was, we think, narrowly focused on the indirect effects issue, and those are conceptually different. So indirect effects that the Court was concerned about were remote in space and time from the project at hand, and here we're talking about effects that are caused by the R5 project that accumulate with other effects caused by other projects. And so Seven County is really inapplicable on that score. Okay. Can I have you address the argument on proper incorporation of the specialist report? It was mentioned, albeit very briefly, and what the District Court said is that although you faulted the agency on the incorporation question, there's no evidence in the record that plaintiffs requested the data underlying the specialist report from the Forest Service and were unable to obtain it. What do you make of the District Court's analysis? Two points, Your Honor. I think that's factually inaccurate. If you look at the comment letters submitted by my clients, there's a number of references to the kind of insufficiency of the information provided and kind of an articulation of the efforts that were made by my clients to obtain information and essentially being stonewalled by the agency. But really, we didn't focus on that because that's beside the point, because even if this Court does credit the specialist reports, there's not evidence of the hard look that's required. So did you get the specialist report or not? There were so many specialist reports, Your Honor, in terms of for each of the three zones here. Some of the specialist reports were provided. Some were provided in draft form, and they were updated after the close of public comment. If the Court would like, I could provide a 28-J letter or something that kind of articulates, you know, which ones were provided when. But again, that's not really the focus of our argument. I guess my question wasn't very, very specific, and I'm focusing now on the Wild and Scenic River portion of the report, SER 93. There is an allegation or an argument regarding whether there's proper incorporation on the facts on the Wild and Scenic Rivers. Yes, Your Honor. Thank you. And that so the agency points to the specialist report and the spreadsheets, and those were never provided. You know, I think we in our But it referenced a specialist report, right? It does not. Were specialist reports with regard to the Wild and Scenic Rivers? I'm sorry, Judge Nguyen. The environmental assessment does not reference the special areas report. So all that's in the environmental assessments is this 54-word conclusory statement of no effect. And there's no reference to the specialist reports. But even if this Court does turn What about the references, you know, the pertinent specialist has reviewed, right, the proposed action? Isn't that a reference to the specialist? Perhaps, Your Honor. Usually, I mean, so there's other places in the environmental assessment where there is specific incorporation by reference. So we would submit that the agency, in terms of the biological assessments and biological opinions that evaluate effects to sensitive species and threatened and endangered species, the agency does make clear that it is incorporating those documents by reference. And there's no such incorporation with respect to That it doesn't say specifically about the report. It says the pertinent specialist has reviewed the proposed action and made the following determinations. And what the district court said was, well, I suppose the district court viewed it as you knew that there were specialist reports out there, and there was no effort to obtain these particular reports. Well, I think I'd fall back then on our second prong of this, which is that even looking at those specialist reports, there's no analysis that amounts to a hard look. And that's particularly true with wild and scenic rivers, because we have all of these river segments, some of which are designated, some of which are eligible for designation, which have all of these unique, outstandingly remarkable values. So the impacts of this project are going to impact those areas in much different ways. And there was no analysis. I think we're trying to discern whether or not the information was available to you. Because the district court said, and I'll quote, here there is no evidence in the record that plaintiffs requested the data underlying the specialist report from the Forest Service and were unable to obtain it. And my submission to Your Honors today is that the wild and scenic specialist report and spreadsheets were not provided to my clients. And if you look at my clients, American Whitewater in particular. You asked for it, and they were not provided? Is that what you're saying? And I'm sorry, Your Honor, today I don't have that information in front of me. I'd be happy to follow up. Well, it's important for this reason is that the public is entitled to comment on reports. And if they are not provided or not available, that may be significant in this case. And your answer is you don't know whether or not they were made available or not or whether they were rebuffed or not. And your argument is they weren't publicly available, which seems to be true. But then the district court says plaintiffs contend that the specialist report fails to support this conclusion, which indicates to me that you had it. Well, I think the ---- Again, I know you want to say it doesn't matter. And we're saying, yeah, it might matter. Very well, Your Honor. And I apologize that I don't have that precise back and forth with the wild and scenic river specialist report. I think what we're alleging here is that the specialist report and the EA say exactly the same thing in terms of there's just categorically going to be no effect. But that's an arbitrary and capricious conclusion because there's an absence of any site-specific hard look. So kind of regardless of whether my client actually had that information, the specialist report and the EA say the same thing. My client was commenting on what the EA said, and it was precisely the same. When you say it's precisely the same, did you have a copy of the report? Not to my knowledge, no. Then why are you saying it's the same? Oh, today we do. So it was included in the administrative record for litigation. If I may, I'll turn to the alternatives claim because as I alluded to at the beginning of my argument, this is where we think everything kind of gets tied together and where the rubber hits the road. Is there a way to meet the public safety objectives of this project while minimizing the scope and degree of impacts? And that's just a question that the agency never evaluated here. This court has held time and time again that the existence of a viable but unexamined alternative renders a NEPA analysis unlawful. And here we had a number of alternatives submitted, but both my clients and other members of the public in terms of can you look at a different geographic scope? Can you look at a lesser degree of intensity of operations? And the agency just simply took those off the table and did this all or nothing approach, no action or action. And, in fact, it actually took no action off the table, so it only looked at a single viable alternative. And that was unlawful really based on the facts and the law. So on the facts, we point out in our briefing how the agency has conceded that it is viable, it is feasible for the agency to reduce the scope and intensity of treatments. And so that's really off the table. And I think the Supreme Court in the seven-county case also did address kind of the feasibility of alternatives question and said that that's really a determination of fact for the agency. But here, again, as a factual matter, the agency has conceded that it is feasible to do this project by reducing the scope of treatments and a lesser degree of intensity. So the agency, at the end of the day, kind of on an ad hoc basis, dropped a number of roads from the final decision. That's at 2 ER 252 through 57. And the Six Rivers National Forest, one of the nine national forests here, actually reduced the scope of the corridor. So the project proposes, and this is what the selected alternative called for, was hazard tree logging operations in a 600-foot corridor on all 5,700 miles of roads. But what the Six Rivers National Forest did at the end of the day in its final decision notice was say we're actually only going to look at a 400-foot corridor. So 250 feet on the upslope side of the road and 150 feet on the downslope side. So that's shrinking the geographic scope and the intensity of operations. So as a matter of fact, alternatives that proposed similar operations were in fact reasonable. And if I may, I'd reserve the remainder of my time. Equibling with the very nitty-gritty of how granular the Forest Service's analysis was, how deep they went into looking at very specific parts in their environmental assessment and in the record. But the Forest Service simply wasn't required to do more, certainly not under NEPA and definitely not after the Supreme Court's decision in Seven County. So this Court should affirm. I'm going to start with Seven County because I think that that's the umbrella that really shades all of this case and is really important in this Court's review. Seven County was a course correction in judicial review of NEPA analysis and reaffirmed that the key principle, the pole star of judicial review of NEPA analysis is deference. It explained that the goal of NEPA is to inform decision-making, foster public participation, not to paralyze decision-making. And I think the key part of Seven County, as it applies here, is that it recognizes that agencies in their environmental analysis invariably make sort of fact-specific, context-specific, and policy-latent choices about the breadth and depth of their analysis. A lot of law has said that before, so is this more like a mood shift or is there anything really substantive in Seven County that you think bears directly on this case? I mean, the Supreme Court called it a course correction, so maybe mood shift is also a way to describe it. But I think the key is that this Court has to defer to the agencies' decisions about where to draw the breadth and depth of their inquiry so long as it falls within that broad zone of reasonableness. And here, you know, all the decisions that the Forest Service made fall within the zone of reasonableness, certainly. I think that's enough to resolve this case. With that Seven County umbrella in place, I'll turn to the specifics of the merits arguments. I'll start with alternatives, unless the Court wants me to take it in a different order. I'm happy to do anything. But yeah, starting with alternatives, plaintiffs recognize in their brief at page 34 that the purpose and need statement here is sufficiently facially broad to cover multiple alternatives. So I think the real question that this boils down to is whether the Forest Service was permitted to incorporate that policy-latent choice about taking a safety-first, safety-oriented approach to hazard tree management on California's national forest. The answer to that question is certainly yes. The Forest Service explains at 1 S.E.R. 35, you know, why it chose to err on the side of safety rather than risking being under-inclusive and risking injury or death to forest users. It explains that it's impossible to tell exactly when a given hazard tree will fall. So failure to cast a wide enough net could endanger safety on the forest. That choice was certainly permissible. As to plaintiffs' specific alternatives that they propose, the agency did evaluate whether or not they were reasonable. That's in the E.A. at 1 S.E.R. 44-45. It explains that with this policy focus on safety that the agency is taking in its purpose and need statement, plaintiffs' proposed alternatives did not meet the purpose and need of the project. To be sure, the Forest Service worked to incorporate commenter-suggested alternatives where it could at 1 S.E.R. 43. The Forest Service explained that it removed some treatments in inventory roadless areas where commentators suggested that and the Forest Service determined that it would not ultimately harm the purpose and need of the project. But it was reasonable for the Forest Service to determine that it made these general determinations in its travel management plans that these roads were necessary to, you know, meet those routes for firefighters or for evacuees. And it was certainly reasonable to draw that line when conducting the environmental assessment for the entire project that all these roads were going to need to be treated. The plaintiff's choice to second-guess the agency's policy decision there is just not one under which they can prevail after 7 County. I'll go to hard look now and environmental effects. Starting with cumulative effects. Again, the Forest Service reasonably chose where to draw the line as to cumulative effects. It conducted a different analysis for each sort of resource that it was analyzing. So for some resources, it looked at a more narrow corridor near the road or trail or facility that was going to be treated. For some resources like watersheds or view sheds, it looked at the entire watershed or view shed scale. It listed out all the ongoing or foreseeable projects that it considered in that analysis at 1 S.E.R. 132 to 53. And it provided specific specialist reports with more detailed quantitative analysis when that was appropriate. So it's not true that there is no quantitative analysis record in our briefs. I think we point to the soil cumulative effects analysis, the watersheds cumulative effects analysis. There's all these technical reports that are specifically designed to provide quantitative analysis and inform the agency's decision making. As to wild and scenic rivers and the specialist reports specifically, I mean, I think fundamentally the threshold NEPA analysis in the E.A. shows that this wasn't an issue that required the Forest Service to drill down even more on. It's only 0.43 percent of the project's total acreage is in a wild and scenic river corridor. And the analysis in the E.A. looking at recreational and scenic values at 1 S.E.R. 89 to 90 just shows that this project is tailored in scope and limited in scope such that it is unlikely to have significant effects, especially where there is so such little intersection between wild and scenic river corridors and the project treatment area. So that analysis was certainly enough. But if that weren't enough, it's also backed up by this specialist report. But my concern is the specialist report apparently wasn't released. My understanding, it wasn't available to the public during the E.A. development process. And I don't think I've seen a case where the specialist report or an expert report was debated. I mean, it wasn't provided. Usually that's the main subject of the debate. So tell me why you didn't provide it. I can't speak to why it wasn't included in the public materials during the administrative process. But what I can say is the Forest Service didn't see this as a major issue while it was developing its E.A. It put out the draft E.A. that has all this information that says there's not going to be major scenic. No, I understand. I'm just saying, you know, if we adopt a rule that you can say we have a secret report we relied on and that's enough, that's contrary to what the Supreme Court has instructed in terms of what the public gets to comment on. And I guess what I would say to that is all this information was in the E.A. that plaintiffs could have commented on. The E.A. says a pertinent specialist reviewed this project. A secret specialist reviewed this and supports our conclusion. How can the public comment on that? I think plaintiffs could have, you know, raised an objection. I shouldn't say objection, but comments to the draft E.A. at that point asking to see the specialist report or raising. The district court did say there's no evidence in the record that plaintiffs requested the data underlying the report and were unable to obtain it. Do you know whether they sought the information and were unable to obtain it? Is that factually accurate, that there was no attempt made to obtain the underlying report? To my understanding, that's factually accurate, but I'm not sure. I haven't seen anything. I didn't see anything in the record that supported that one way or another. Whether they requested? Yes. Yes. I don't think there's anything in the record that speaks on that. And if they did, what the response was? In other words, if they asked and you said, no, you can't see it, but we're going to rely on it, that's of some significance. Right. That would be a problem. And so we don't know. Well, there's nothing in the record that says that. What I will say, there is information in the record showing that some plaintiffs' groups did request specific information and the Forest Service provided it. What is that? At 4. No, I mean, what does that have to do with the specialist? Oh, sure. No, this isn't about the specialist report specifically. I mean, you're saying, yeah, we did it in some other cases, but. Yes. But they haven't pointed. I mean, I think fundamentally the burden, if they're saying we asked for this and it wasn't provided, they would have to point to somewhere where they asked for it and it wasn't provided, and they haven't done that. But what are we actually talking about here? Is it just data that shows the overlap between the roads and the rivers? Essentially, it's data along with a little bit of supporting analysis. Granted, it's not pages and pages of supporting analysis. Is the supporting analysis just talking about the essentially lack of coincidence between those two things? We're talking about a very small amount of mileage here. Yeah, I think it goes to that. It talks about the small amount of overlap, again, 0.43% of the overall project overlapping between Wild and Scenic River corridors and the project treatment area. But her argument would really be that it's plain from the environmental assessment that this wasn't an issue that the Forest Service had to dig down on further. It reasonably drew the line there. It looked at certain effects from the project, like scenic effects, like effects on recreation. It explained that it reviewed Wild and Scenic Rivers and that just because of how small a footprint this project has on Wild and Scenic Rivers, particularly, that there weren't likely to be significant environmental impacts. And plaintiffs don't challenge that conclusion that there weren't likely to be significant environmental effects. They just say that you needed to do a little bit more. You needed to be a little more granular. I think under Seven County, this Court has to defer to the agency's choice on where to draw that line because it was more than reasonable in this case where there's so little overlap. I think fundamentally, here, the NEPA process was more than enough to inform public participation, inform the agency's decision-making. Bearing in mind that NEPA is designed to inform agency decision-making and not to paralyze it, I think the correct course here is to affirm, and I would just briefly note on remedy, that even if the agency's analysis falls short in some respect, Seven County also instructs courts to not vacate the underlying decision, absent some reason to believe that there would be a change. And here, where we're talking about really minute, granular analysis about very specific resources, it would not be proper to vacate the project if the court found some error. Unless the court has any further questions, I'm happy to sit down. Thank you, Counsel. Thank you, Your Honors. So I'll direct the Court to 4ER739, and this is the comment letter from American Whitewater that kind of addresses this issue that we've been discussing today. At the bottom of that page, American Whitewater says, it is apparent that the three EAs were prepared hastily and that they lack site-specific information and that the proposed treatment areas have not been evaluated through fieldwork. This, along with the omission of key specialist reports, e.g. fisheries, recreation, and scenery, and the incomplete nature of other reports in supporting documentation, calls into question the sufficiency of the overall analysis. I think my client is pointing out that there are several relevant specialist reports that were not provided, fisheries, recreation, and scenery, that would bear on impacts to wild and scenic rivers. But because my client didn't even point to this special areas report, they didn't even know about it. Yeah. If I understand your argument, though, your primary argument is that now that you've seen it, it doesn't differ from what's contained in the EA. Essentially, yes, Your Honor. It's just this conclusory statement of no effect that's not backed up by any supporting analysis. And so my friend on the other side says, well, look, it's only a small number of miles affected. But that's inappropriate dilution of impacts. Each one of these river corridors has unique and, in some cases, congressionally protected attributes that make them outstandingly remarkable values. And without any site-specific analysis of those values, there's no way to actually look at how this project is going to impact those values. And I would point this Court to its recent opinion in Wild Earth Guardians v. APHIS, which addresses this question pretty closely and analogously in the context of wilderness areas and wilderness study areas, where there, like here, the agency only looked at kind of a broad brush review of impacts to these areas across a large scale. And the Court said, well, you're inappropriately diluting the impacts by adopting such a broad scale. Each of these wilderness areas is protected based on their unique set of resources. And without an analysis of those resources, you can't actually meet your obligation to take a hard look. In terms of the purpose and need statement, our overall position is that this Court's precedents generally teach that the Court interprets purpose and need statements capaciously. And our position is that there's a way to do that here. Overall, public safety is the agency's primary goal. That still begs the question, is there a way to meet the basic public safety goals while manipulating treatments in some areas, i.e. reducing the geographic scope, reducing the intensity, so that we can protect other values? The purpose and need statement is sufficiently broad to accommodate such alternatives. If, however, it's not, then we have a classic case of a purpose and need statement being unreasonably narrow, because what the agency is doing is interpreting the purpose and need in such a way so as to reject from detailed consideration any alternative other than here's our predetermined set of operations on 5,080 miles of roads. And that's the only thing that we're going to consider. That's the only thing that our purpose and need allows us to consider. That is unreasonably narrow. In terms of cumulative effects, my friend points to, you know, deference to the scope of the analysis in terms of cumulative effects. But as we point out with McFarland, McFarland is right on top of this project. It treats the exact same, the R5 project will treat the road segment. The McFarland project will treat all of the acres outside of that narrow road segment. These are right on top of one another. I think just in closing, Your Honors, we can all appreciate the devastating fires. My clients are the ones who live with this and fire danger every day. Many of them live out in these areas. But it still begs the question, as I alluded to, is there a way to meet these public safety objectives while minimizing impacts to ecologically sensitive areas? And again, the agency just never asked that question. In terms of Seven County, my friend on the other side basically suggests that that case dramatically reshaped judicial review. But what the court did in that case was advise that the court's role is to confirm that the agency addressed environmental consequences and feasible alternatives. And that's exactly what this case presents. We respectfully ask this court to reverse the judgment of the district court. Thank you very much, Counsel, to both sides for your helpful arguments this morning. The matter is submitted, and that concludes this morning's argument calendar. It will be in recess until tomorrow morning. All rise.
judges: THOMAS, NGUYEN, BRESS